# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDIE ZAVALA CASTILLO,<br>Petitioner,<br>v.<br>YESHA HILL,<br>Respondent. | Case No. 1:25-cv-01237-JLT-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On September 13, 2022, Petitioner was convicted by a jury in the Merced County Superior Court of assault with a firearm, assault with a deadly weapon, criminal threats, two counts of felony possession of a firearm, carrying a concealed weapon in a vehicle, and unlawful possession of ammunition. The jury also found true a firearm enhancement. (1 CT[1] 195–202.) On September 27, 2022, the trial court found true the Three Strikes and prior serious felony conviction enhancement allegations. (1 CT 205.) On November 4, 2022, Petitioner was sentenced to an aggregate imprisonment term of twenty-four years and four months. (1 CT 225–27.) On April 5, 2024, the California Court of Appeal, Fifth Appellate District affirmed the

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 9.)

judgment. People v. Castillo, No. F085287, 2024 WL 1473750 (Cal. Ct. App. Apr. 5, 2024). On June 18, 2024, the California Supreme Court denied the petition for review. (LDs[2] 13, 14.)

On September 19, 2025, Petitioner filed the instant petition, raising the following claims for relief: (1) the trial court's erroneous failure in denying a defense request to instruct on circumstantial evidence; (2) the trial court's abuse of discretion in denying a motion to strike a prior conviction; (3) the trial court's failure to apply California Penal Code section 654 in sentencing; (4) the trial court's imposition of maximum restitution without considering Petitioner's ability to pay; (5) ineffective assistance of trial counsel; and (6) erroneous admission of uncharged criminal conduct. (ECF No. 1.) On November 18, 2025, Respondent filed an answer. (ECF No. 10.) To date, no traverse has been filed, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[3]

***Assaults on Francisco Santos***

> Francisco Santos knew Castillo from his neighborhood and identified him at trial. Sometime before the incident leading to criminal charges, Santos had a conversation with Castillo concerning his goddaughter. Castillo told Santos to leave and that he had a gun.
>
> Santos was walking home from church on Golden Rule Avenue in Winton on September 8, 2021.[4] Castillo drove his truck next to Santos, who saw Castillo as he passed by. Castillo turned the truck around, pointed it at Santos, and drove toward Santos at a high speed. Santos moved away, avoiding getting hit, but caught his foot in a hole, twisting his ankle and falling down.[5] After Castillo missed Santos, Castillo stopped the truck.
>
> Castillo exited the truck and walked toward Santos. As he did so, Castillo pointed a handgun at Santos.[6] Santos was getting up when Castillo ordered Santos to "[k]neel down, mother[****]er." Castillo told Santos that Castillo was going to kill Santos. Santos asked Castillo to wait and calm down. Santos did not try to

---

[2] "LD" refers to the documents lodged by Respondent. (ECF No. 9.)
[3] The Court relies on the California Court of Appeal's April 5, 2024 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[4] A week prior to this encounter, someone tried to run over Santos with a truck. Santos thought it might have been Castillo because the truck looked like one Castillo owned, but Santos was not sure about who was driving during this first encounter.
[5] Santos explained he was walking with the aid of a walker. When Castillo saw the truck nearby, he "just threw it" into the street somewhere.
[6] Santos testified that the handgun was either a .380-or .38-caliber. The handgun was also described as being a .38-caliber by another witnesses, Gabriella C. As explained at page 9, post, the police seized a .380-caliber handgun.

defend himself because his knee and back were hurting. Castillo hit Santos with the gun two or three times on the head. Santos verified that two photographs taken later by an officer depicted injuries inflicted by Castillo, including to Santos's head. There were two lacerations from being hit with the handgun that split open Santos's head.

Santos was unclear about what happened to the handgun next. Either someone took it from Castillo's hand, or Castillo lost control of the gun, and it got lodged in a fence. Santos was kneeling and squatting. Castillo jumped on top of Santos and hit him two more times. Castillo looked around for someone he may have thought was there, apparently saw no one, came back, found the gun, and drove away.

Sometime before this incident, Santos had a conversation with Castillo concerning Santos's goddaughter. Castillo appeared to Santos to be upset after the conversation. Santos said he was not afraid of Castillo. Eight days before the September 8, 2021 incident, someone tried to run over Santos, but Santos was not certain who was responsible.

During prior preliminary hearings in October 2021 and July 2022, Santos testified that the person who hit him was bald and there were three people involved in the attack. Santos could not recall prior testimony that his attacker hit him with a rock but remembered denying Castillo attacked him and that he could not remember seeing a weapon. At trial, Santos explained he had lied during the preliminary hearings because he was worried about his family. Santos explained that Castillo was the only person who attacked and hit him.

Jesus Benavides was working as a detective with the Merced County Sheriff's Office. On September 8, 2021, he went to an address in Winton and contacted Santos. Benavides photographed injuries Santos had suffered. One picture depicted a laceration to Santos's left ear. A second picture depicted a laceration to the back of Santos's head. Santos identified his attacker to Benavides using Castillo's moniker and specifically described a tattoo over Castillo's right eye. Santos also identified a photograph of Castillo as being his attacker.

Benavides went to the fence where Santos thought Castillo may have dropped a gun but did not find the weapon. Benavides, however, discovered a video surveillance recording. The video camera was facing toward Golden Rule Avenue. The video, exhibit 108, was admitted into evidence and played for the jury. Benavides checked the timing on the video and determined the video timer was accurate.

Benavides testified about what the video depicted after it was played for the jury. He said the video showed a truck driving west down Golden Rule Avenue and initially described the truck making a U-turn, but then described it making a three-point turn. A person was walking west on Golden Rule Avenue. After making the turn, the truck was facing east toward the pedestrian. The truck backed up, stopped, and 35 seconds into the video, the truck accelerated toward the pedestrian who moved quickly away. The pedestrian remained out of view thereafter because there was a fence in the way.

After the truck stopped, both doors opened, and people exited. The person on the passenger side of the truck stayed near the passenger side door, and though it was hard to tell, there was movement of two people. Then there was movement near the driver's side door, the brake lights flashed, and the truck drove off.

Exhibit 108 was made a part of the record on appeal. It depicts more detail than Benavides briefly described in his testimony. A truck was traveling west on what the witnesses described as Golden Rule Avenue. Golden Rule Avenue is not a wide or particularly long street. The truck made a left turn onto another perpendicular road in front of the camera. The truck stopped, backed up, moved forward, and backed up much farther in what matched Benavides's description as a three-point turn. The truck stopped briefly and was pointing in the direction Benavides described as east on Golden Rule Avenue.

A pedestrian came into view at the top of the camera angle as the truck completed the turning maneuver. The pedestrian, who was obviously limping, was walking west toward the truck. The video's quality is not high, but it is possible from the pedestrian's walking pattern that he was using a walker. The truck accelerated rapidly east toward a pedestrian. The pedestrian increased his own pace managing to narrowly avoid getting hit by the truck. It appeared the pedestrian plunged forward to the ground, to the side of another vehicle parked perpendicularly to Golden Rule Avenue, just before the truck would have otherwise hit him. There was a fence obstructing the camera view of the pedestrian.

The doors of the truck opened seconds after it stopped. The driver exited the truck and stood for several seconds before moving toward where the pedestrian had fallen to the ground. The driver remained out of view for nearly a minute before getting back into the truck and driving away from the scene.

***Incident with Gabriella C.***

Gabriella C. (Gabriella) was dating Castillo when she went to make a statement with the Atwater Police Department on September 16, 2021. Gabriella spoke to Officer Emily Huckabee about a gun Castillo had in his truck. Gabriella testified that she told Huckabee she had seen a gun in Castillo's truck and that it was his gun, but then testified the gun did not belong to Castillo. Gabriella did not remember telling Huckabee about having an argument with Castillo.

Gabriella said she did not remember seeing Castillo grab a gun from a pile of clothes before she went to the police department. Gabriella did not remember telling Huckabee that the .38-caliber gun was black or gray and was always loaded. Gabriella denied telling Huckabee that Castillo always kept the gun with him in his truck. Gabriella said she only saw Castillo with a gun once, although it was not him who carried it, he was with a friend who was carrying a gun.

Gabriella denied being in a romantic relationship with Castillo, explaining that they were hardly friends. When asked by the prosecutor if Castillo wanted to have sex with her that day, defense counsel's objection to the line of questioning was overruled. Gabriella denied Castillo had asked her for sex that day.

Gabriella said she did not remember when asked if she went to the police station after having an argument with Castillo. She described having a conversation with Castillo. Gabriella denied Castillo saying he was going to be locked up that day and that he did something. Gabriella denied Castillo telling her that night was the last night she would see him, asking her to have sex with him, or sexually assaulting her. Gabriella said she could not remember if Castillo grabbed a gun from a pile of clothes that day. She denied reporting that Castillo pointed the gun at her.

Gabriella said she only saw Castillo around a gun when he was with his friends. Once, Gabriella saw a friend place a gun in the cupholder of Castillo's truck while Castillo was also in the truck. Gabriella denied saying Castillo always had a gun with him. Gabriella denied dating Castillo for a month before she went to the police station and said they "were just friends."

Gabriella denied that Castillo tried to rip off her pants. She denied that he placed his face on her vagina. Defense counsel's objection to the next question pursuant to Evidence Code section 352, subdivision (b) was overruled. Gabriella denied that Castillo bit the top of her vagina. Gabriella further denied reporting that Castillo accused her of sleeping with other men or that she kicked him and called him a bitch. Gabriella denied that Castillo tried to choke her with his arm, they wrestled on the floor, he punched her on the head, and he bit her left arm. Gabriella claimed she had lied when she talked to Huckabee but was telling the truth during her trial testimony.

Prior to Officer Huckabee's testimony, defense counsel objected to the entire line of questioning pursuant to Evidence Code section 352. The court overruled the objection. Huckabee testified that Gabriella came to the police department lobby afraid, upset, and nervous. She wanted to talk privately to Huckabee about Castillo. Gabriella told Huckabee that she was in a dating relationship with Castillo. Castillo told her he wanted to have sex because he was going to go to jail. They began to argue because Gabriella did not want to have sex. Castillo told Gabriella, " 'I am going to get locked up today. I did something.' " Castillo added, " 'Tonight is the last night you will see me. Have sex with me.' " Gabriella replied, " 'No.' "

Gabriella told Huckabee that Castillo laid on top of Gabriella, pulled her pants off, placed his head between her legs, and bit the top of her vagina. The two argued after Castillo accused Gabriella of sleeping with someone else, and she kicked him off the couch. Gabriella called Castillo a bitch, and Castillo choked Gabriella with his arm. Gabriella punched at Castillo. The two wrestled on the floor. Castillo was crying and told Gabriella that he did not want to hurt her, then he hit her several times on the head with a closed fist. Castillo explained to Gabriella that if he wanted to hurt her, he " 'would have killed [her] already.' " Castillo also bit Gabriella's left arm.

From what Huckabee observed, she could tell Gabriella had been in an altercation. There were indications of this on her hand, arms, neck, face, and vagina. Gabriella told Huckabee that Castillo pulled a loaded .38-caliber high-point black and silver handgun from a pile of laundry and pointed it at Gabriella. Gabriella explained that Castillo kept the gun in the cupholder or underneath the seat of his truck.

***Castillo's Arrest and Search of His Truck***

On September 17, 2021, Officer Charles Lord-Huff was working for the Atwater Police Department. Lord-Huff was told by Huckabee where to look for Castillo's handgun and participated in a search of Castillo's truck. Lord-Huff found a handgun near the center console. The magazine of the gun had ammunition, but there was no bullet in the firing chamber. The gun was operable. Castillo was arrested.

Officer LaRon Harley also participated in the search of the truck. Harley found a glove in a cupholder. When he removed it, Harley discovered 15 to 20 rounds of

> ammunition in the glove. There was also a white powdery substance in a small baggie under the glove. The parties stipulated the substance tested as 3.608 grams of methamphetamine. Harley stated it was a useable amount of methamphetamine. The firearm was black semiautomatic .380-caliber handgun. There were 25 rounds of 9-millimeter, two rounds of .223, and two rounds of .380 ammunition.

Castillo, 2024 WL 1473750, at *2–5 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Merced County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

(internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## DISCUSSION

### A. Instructional Error

In Ground One, Petitioner asserts that the trial court erred in denying the defense's request to instruct the jury on circumstantial evidence. (ECF No. 1 at 4, 8–20.) This claim was

raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying the circumstantial evidence instructional error claim, the California Court of Appeal stated:

> Castillo contends the trial court erred in failing to give circumstantial evidence instructions. Castillo argues that photographs of Santos's injuries and Castillo's inculpatory statements to Gabriella were types of circumstantial evidence and the court had a sua sponte duty to give proper instructions. We find that the evidence in question was either direct evidence, or if it was circumstantial evidence, it was circumstantial evidence used to corroborate other direct evidence and that the circumstantial evidence instructions would have been misleading and improper.
>
> ***Defense Request for Circumstantial Evidence Instructions***
>
> Defense counsel requested the jury be instructed with CALCRIM Nos. 223, 224, and 225. Defense counsel argued the photographs of injuries to Santos's head were susceptible to two or more conclusions as to how the lacerations could have happened. The court observed that the People were relying on direct evidence to prove assault, including Santos's eyewitness testimony. The court described the photographs taken of Santos's head as further direct evidence because Santos identified his own head in the pictures and explained they depicted where he was injured. The court noted the People were only relying on direct evidence and defense counsel was free to argue the injuries came from another source.
>
> After a recess, defense counsel further requested circumstantial evidence instructions for testimony that Gabriella heard Castillo say that he did something and told Gabriella to have sex with him. Defense counsel argued there were several reasonable inferences that could be made from the statements, including that Castillo did something else or was just trying to have sex with his girlfriend. The court agreed reasonable inferences could be drawn from the statements but disagreed they were circumstantial evidence. The court explained they were direct evidence Gabriella said she heard. Although different inferences could be drawn, they were not circumstantial evidence.
>
> The prosecutor said he "kind of" bought the argument that the statements were circumstantial evidence because they were not direct evidence of the crime itself, although he added that the People were not substantially relying on circumstantial evidence. Defense counsel added that the statements could refer to multiple different acts, although one inference was that Castillo was admitting he assaulted Santos.
>
> In denying the motion, the court reasoned that if Castillo had said that he hit Santos with a firearm, the statement was direct evidence Castillo did so. When Castillo said that he did something and was going away, the nature of the statement did not change. It was direct evidence of what Castillo said. The court

conceded one could make different inferences from the statement but concluded it was not circumstantial evidence.

***Analysis***

Circumstantial evidence involves a two-step process. The parties present evidence, and the jury decides which reasonable inference or inferences, if any, to draw from the evidence. Direct evidence stands on its own, no need ever arises to decide if an opposing inference suggests innocence. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166.)

The trial court is required to instruct the jury on general principles of law relevant to the issues raised by the evidence. (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591.) A trial court must instruct sua sponte on circumstantial evidence when the prosecution relies substantially on circumstantial evidence to prove guilt. (*Ibid.*) Circumstantial evidence instructions should not be given when the problem of inferring guilt from a pattern of incriminating circumstances is not present or when circumstantial evidence is incidental to and corroborative of direct evidence. (*People v. Wright* (2021) 12 Cal.5th 419, 451 (*Wright*); *People v. Rogers* (2006) 39 Cal.4th 826, 885.)

CALCRIM No. 224, the circumstantial evidence instruction, need only be given when the prosecution substantially relies on circumstantial evidence to establish an element of the offense. It should not be given where circumstantial evidence is incidental to and corroborative of direct evidence. (*Wright*, *supra*, 12 Cal.5th at p. 451; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171.) CALCRIM No. 225 is used in place of CALCRIM No. 224 when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence. (*Samaniego*, at pp. 1171–1172.)

The photographic evidence of the injuries Santos suffered are direct evidence of those injuries. Santos's testimony was further direct evidence that he was injured by Castillo. During his testimony, Santos identified the pictures as depicting the injuries he described to the jury. The pictures stand on their own, there is no need to decide if an opposing inference suggests innocence. (See *People v. Livingston*, *supra*, 53 Cal.4th at p. 1166.) Castillo's inculpatory statements appear to entail both direct and circumstantial evidence. The fact that Castillo made the statements to Gabriella is direct evidence. The truth of what those statements stood for is more like circumstantial evidence because one has to draw inferences that Castillo was referring to his assaults of Santos. (See *Wright*, *supra*, 12 Cal.5th at p. 452; *People v. McCullough* (1979) 100 Cal.App.3d 169, 178– 180.)

If Castillo's inculpatory statements are circumstantial, at least in part, the trial court still properly refused Castillo's request to give the jury circumstantial evidence instructions. The People's case was based almost entirely on direct evidence. Santos's account of how Castillo assaulted him with his truck and gun was all direct evidence. The photographs of Santos's injuries were verified by Santos to be pictures of his injuries and were direct evidence of the physical consequences that arose from Castillo's assaults. To the extent that Castillo's inculpatory statements to Gabriella are circumstantial, they only corroborate other direct evidence produced by the People.

We reiterate that circumstantial evidence instructions should not be given when the problem of inferring guilt from a pattern of incriminating circumstances is not present, or it is incidental to and corroborative of direct evidence. (*Wright*, *supra*,

> 12 Cal.5th at p. 451; *People v. Rogers*, *supra*, 39 Cal.4th at p. 885; *People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1171.) Castillo's inculpatory statements to Gabriella were merely corroborative of direct evidence even if they were circumstantial in nature. The trial court did not err in denying Castillo's request to include jury instructions on circumstantial evidence.

Castillo, 2024 WL 1473750, at *9–10.

"[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether the challenged instruction "is undesirable, erroneous, or even 'universally condemned,'" "but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 146, 147 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). "It is well established that the [ailing] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). This instructional error standard also applies to ambiguous and omitted instructions. Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001). The Supreme Court has stated that "[t]he significance of the omission of . . . an instruction may be evaluated by comparison with the instructions that were given." Henderson v. Kibbe, 431 U.S. 145, 156 (1977). The Supreme Court also noted that an "omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 155.

The state court reasonably concluded that the prosecution was based almost entirely on direct evidence and Petitioner's inculpatory statements were merely corroborative of direct evidence even if they were circumstantial in nature. Petitioner has not shown that the omission of a circumstantial evidence instruction "so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147. See Henderson, 431 U.S. at 155 (noting that the "burden is especially heavy because no erroneous instruction was given").

Based on the foregoing, the state court's denial of Petitioner's instructional error claim regarding circumstantial evidence was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision

was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on Ground One, and the claim should be denied.

**B. Sentencing Claims**

1. Denial of Motion to Strike Prior Conviction

In Ground Two, Petitioner asserts that the trial court erred in denying the defense's motion to strike a prior conviction at sentencing. (ECF No. 1 at 4, 21–28.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding the trial court's failure to dismiss the prior strike, the California Court of Appeal stated:

> ***Introduction***
>
> Castillo contends the trial court abused its sentencing discretion in denying his motion pursuant to *Romero, supra*, 13 Cal.4th 497. At sentencing, Castillo argued his parents divorced when he was 11 years old and he never saw his father again, which affected his development and his relationship with his mother. Castillo joined a gang when he was 15 years old and began using illegal drugs. Castillo filed a declaration stating he had made many mistakes in his life, was full of remorse over his mistakes and the crimes he had committed, and planned to take full advantage of programs offered in prison. Castillo argued he was outside the spirit of the Three Strikes law. On appeal, Castillo argues these points. Castillo also argues that his commitment to self-improvement sets him apart.
>
> The trial court found several sentencing factors in aggravation, including that the assaults were callous, Castillo's prior convictions as an adult were numerous and of growing seriousness, and his prior performance on probation had been unsatisfactory. The court noted Castillo had filed a motion pursuant to *Romero* to strike his prior felony strike conviction. The trial court acknowledged its authority under section 1385 to strike enhancements but declined to do so, noting that Castillo was recently on parole for a prior section 422 offense. The court found a likelihood that dismissal of the enhancements would result in physical injury or serious danger to others.

\\\

***Analysis***

A trial court may strike or dismiss a prior serious felony conviction in the interests of justice that would otherwise be imposed pursuant to the Three Strikes law. (§ 1385; *Romero, supra*, 13 Cal.4th at p. 504.) The factors to be considered by the trial court in this determination are the nature of the circumstances of the defendant's past and current felonies; the particulars of the defendant's background, character, and prospects; and, whether the defendant could be deemed outside the sentencing scheme's spirit, in whole or in part. (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

The trial court's ruling on a *Romero* motion is made under the deferential abuse of discretion standard—requiring the defendant to show the sentencing decision was irrational or arbitrary. It is insufficient to show that reasonable people may disagree about whether to strike a prior conviction. The Three Strikes law establishes a sentencing norm and carefully circumscribes the trial court's power to depart from that norm. The law creates a strong presumption that any sentence conforming to these sentencing norms is rational and proper. Only extraordinary circumstances justify finding that a career criminal is outside the spirit of the Three Strikes law. (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

In August 2010, Castillo entered pleas to his first two felonies, making a criminal threat (§ 422) and false imprisonment with violence (§ 236). He also admitted committing misdemeanor inflicting corporal injury on a spouse/cohabitant (§ 273.5, subd. (a)) and misdemeanor willful cruelty to a child (§ 273a, subd. (b)). The charges were brought the year before when Castillo was 25 years old. In 2017, Castillo admitted committing misdemeanor driving under the influence of alcohol (Veh. Code, § 23152, subd. (b)) and misdemeanor corporeal injury on a spouse/cohabitant (§ 273.5, subd. (a)). In 2019, he admitted committing three misdemeanor allegations of violating a court order to prevent domestic violence (§ 273.6, subds. (a)(d)) and being a felon in possession of a firearm (§ 30305, subd. (a)(1)). In 2020, Castillo entered a plea to a new felony allegation of making a criminal threat (§ 422) and received a prison sentence of two years.

Castillo argues on appeal that his commitment to self-improvement sets him apart from those who should be considered within the framework of the Three Strikes law. Although Castillo signed a declaration stating remorse and a commitment to improving himself, he refused to allow his probation officer to interview him about his personal or employment history and his substance abuse or treatment history. The probation officer noted that the attack on Santos with the firearm could lead to Chronic Traumatic Encephalopathy and because Castillo refused to talk with the probation officer, Castillo showed no remorse for his conduct, making him a danger to community safety.

Castillo had a misdemeanor conviction in 2012 for driving with a suspended license and a drunk driving conviction in 2016. Thereafter, Castillo was consistently before the courts for misdemeanor violations of domestic violence, violating domestic violence orders, and being a felon in possession of a firearm. All of these convictions had a violent dimension to them even though they were not felony convictions. In 2019, Castillo entered a plea to making a criminal threat, a felony, and was sentenced to two years in state prison. When Castillo committed the instant offenses, he was no longer a youthful offender but a 37-year-old adult.

\\\

> The trial court had before it a grown adult with a history of making criminal threats and engaging in domestic violence. For a perceived slight from Santos, Castillo tried to run Santos over with a truck. Castillo then trained a .380-caliber handgun on Santos and made a criminal threat before walking over to him and violently hitting him on the head with a gun, splitting open his scalp. Santos was barely ambulatory, walking with the aid of a walker, which he tossed to the side before plunging out of the street to avoid being smashed by Castillo's accelerating truck.
>
> In addition to his violent conduct, Castillo refused to talk to his probation officer. Notwithstanding his self-serving statement of remorse in his declaration, Castillo's refusal to be interviewed by his probation officer showed a lack of remorse for his conduct and implied contempt for the sentencing proceeding itself. Castillo could have expressed remorse for his conduct during the sentencing proceeding but chose not to do so. The trial court did not abuse its sentencing discretion in denying Castillo's motion to strike his prior serious felony conviction pursuant to *Romero* and section 1385.

Castillo, 2024 WL 1473750, at *13–14.

Whether the trial court abused its discretion in declining to strike one of Petitioner's prior convictions is an issue of state sentencing law that is not cognizable in federal habeas corpus. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."). Petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court erred in denying the request to strike one of Petitioner's prior strike convictions.

2. California Penal Code Section 654

In Ground Three, Petitioner asserts that the trial court erred in failing to apply California Penal Code section 654 and imposing separate sentences for separate acts that happened at the same time and were done for a common objective. (ECF No. 1 at 5, 29–37.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The claim was also raised in the petition for review, which the

California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's claim regarding California Penal Code section 654, the California Court of Appeal stated:

> At sentencing, Castillo's counsel moved pursuant to section 654 to have the court impose sentence on counts 1 (§ 245, subd. (a)(1) [assault with a vehicle]), 2 (§ 245, subd. (a)(2) [assault with a firearm]), 3 (§ 422, subd. (a) [criminal threat]), and 5 (§ 29800, subd. (a)(1) [felon in possession of a firearm]).[7] The trial court denied the motion finding Castillo had separate criminal intents to (1) strike Santos with his truck, (2) exit his truck, point his gun at Santos, and order Santos to his knees, (3) use the gun to strike Santos in the head multiple times, and (4) possess a firearm even though he knew he was legally prohibited from doing so. Castillo contends the trial court violated section 654 in sentencing him on each of the first three counts because he was engaged in a single course of conduct. We disagree because there was evidence to support the trial court's finding of separate criminal intents for each count.
>
> Section 654 precludes multiple punishments for a single act or an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Broadbent* (2020) 47 Cal.App.5th 917, 921 (*Broadbent*).) Whether a course of criminal conduct is divisible, leading to more than one act, depends on the intent and objective of the defendant. If all of the offenses were pursuant to a single objective, the defendant may be punished for any one of those offenses but not for more than one. (*People v. Correa* (2012) 54 Cal.4th 331, 336; *Broadbent*, at p. 921.)
>
> An implicit determination that there was more than one objective is a factual determination and must be sustained on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730; *Broadbent, supra*, 47 Cal.App.5th at p. 921.) The trial court "is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact that the trial court could have reasonably deduced from the evidence. (*Ibid.*)
>
> A course of conduct divisible in time, even though it may have a single objective, may give rise to multiple crimes and punishment. Section 654 does not apply where a defendant has had a chance to reflect upon his or her actions. (*People v. Gaynor* (2019) 42 Cal.App.5th 794, 803–804.) *Gaynor* held that there were distinct types of harm in stealing the victim's identity and possessing a check to defraud a bank. (*Id.* at p. 804.) *People v. Jimenez* (2019) 32 Cal.App.5th 409, 424–425 found the Jimenez's evasion from a pursuing officer and subsequent crash into another patrol car had separate purposes even though it was a continuous course of conduct. *People v. Lopez* (2011) 198 Cal.App.4th 698, 717–718 found theft of the victim's purse and later use of her credit card were

[7] On appeal, Castillo does not contend the trial court erred in sentencing him on count 5 and limits his argument to the first three counts.

temporally separated and afforded Lopez an opportunity to reflect and renew his intent.

Other cases have found separate, although nearly simultaneous, objectives by defendants. In *People v. Coleman* (1989) 48 Cal.3d 112, 162–163, the court found Coleman's assault of the robbery victim had a separate intent and objective from the robbery. Coleman had compelled the victim to assist him and completed the robbery. After shooting and killing a second victim who had entered the room, Coleman forced the first victim to lie down and stabbed her in the back to prevent her from sounding the alarm about the murder. (*Id.* at p. 162.) Shooting a victim during a robbery was divisible from the robbery itself, which could have been accomplished without gratuitously shooting the helpless and unresisting second victim. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 189–190.)

Castillo's section 654 argument relies on *People v. Mendoza* (2022) 74 Cal.App.5th 843, 853–856 (*Mendoza*), which found section 654 applicable to an assault that included multiple blows. Mendoza was extorting the victim, sought payment, and was unsatisfied with the amount offered. Mendoza precipitated an altercation with the victim, stabbing at him with a knife. Ultimately, Mendoza slashed the victim's face and punched the victim with his fists. (*Id.* at p. 848.) The *Mendoza* court found, notwithstanding the variation in instrumentalities used, no reflection by Mendoza on his conduct before he delivered the punches. (*Id.* at pp. 855–856.) Mendoza described his attack as " 'a classic 'one-two punch," ' " and the victim explained it all happened quickly, without interruption between Mendoza's blows. (*Id.* at p. 855.)

The trial court did not expressly state how Castillo had a separate criminal intent for each of counts 1 through 3. The court's findings, however, are entitled to deference and must be sustained if there is substantial evidence to support the trial court's implicit finding. (*People v. Osband, supra*, 13 Cal.4th 622 at p. 730; *Broadbent, supra*, 47 Cal.App.5th at p. 921.) The attack described in *Mendoza* is different from what Castillo did to Santos. Castillo first drove past Santos, turned his truck around in the street, aimed his truck directly at Santos, and accelerated toward Santos in an attempt to hit him. After Santos narrowly evaded this assault, Castillo stopped his truck, placed it in park, exited his truck, pulled out his handgun, pointed it at Santos, ordered Santos to his knees, and threatened to kill him. There was time to reflect between Castillo's assault with a vehicle and his criminal threat.

After Castillo pointed his handgun at Santos and commanded him to the ground, Castillo walked over to Santos. Again, Castillo had time to reflect before he started a fresh assault on Santos, using his handgun to hit Santos several times. This was not the type of mutual combat fight in *Mendoza* that was uninterrupted once it began. Santos was already immobilized from prior injuries and his foot being caught. Santos offered no resistance and testified that he told Castillo to calm down, giving Castillo another moment to reflect between making the criminal threat and proceeding to assault Santos with his handgun.

There is little doubt from the trial testimony, as well as the surveillance video evidence, that the two assault allegations were divisible. After narrowly missing Santos with his truck, Castillo stopped the truck, pausing a moment before opening the door and exiting the truck. He then appeared to stand in place for another interval before moving down out of view of the video camera. Castillo had adequate time to reflect between the first assault and making the criminal threat.

> What is less clear from the surveillance video is what happened after Castillo exited the truck. He paused for an interval before moving out of the camera's view. The interval from that moment until he got back into the truck was nearly a minute. Santos's testimony was that Castillo pointed a gun at him, yelled an epithet, told Santos to kneel down, and threatened to kill him. Santos told Castillo he could not move. After threatening Santos and pointing the handgun at him, Castillo began to pistol whip Santos.
>
> Whether the criminal threat and the assault with the firearm were part of the same act is a closer issue because there was little separation between the two acts. There was evidence, however, that Castillo harbored separate criminal intents for the criminal threat and the assault with a firearm. Gabriella denied telling Officer Huckabee about Castillo's inculpatory statements at trial, disavowing her original statements. Santos's preliminary hearing testimony attributing the attack to someone who was not Castillo was different than his trial testimony identifying Castillo as the assailant. Santos explained his preliminary hearing testimony was different because he feared for his family's safety.
>
> Based on the trial court's own observations of the witnesses and the demeanors they exhibited during their testimony, there was evidence from which it could have found that Castillo harbored different criminal intents when he made the criminal threat against Santos before deciding to assault Santos with the firearm. Causing Santos to fear Castillo by making the criminal threat could well cause Santos to choose not to report Castillo's crimes, or if he did report them, to not testify against Castillo. This nearly happened. Gabriella chose at trial not to verify her statements to Huckabee about Castillo's inculpatory statements. There was evidence before the trial court that Castillo caused fear in two of the witnesses by pointing his handgun at them and making threats.
>
> We conclude there was substantial evidence that Castillo's two assaults occurred after he had enough time to reflect on his conduct. There was also substantial evidence that Castillo's intent to make a criminal threat was different and apart from either of his assaults on Santos. We therefore reject Castillo's contention that the trial court violated section 654's prohibition of punishment for a single criminal act or course of conduct.

Castillo, 2024 WL 1473750, at *10–13 (footnote in original).

Whether Petitioner was punished in violation of California Penal Code section 654 is an issue of state sentencing law that is not cognizable in federal habeas corpus. See Corcoran, 562 U.S. at 5 ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Christian, 41 F.3d at 469 ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."). Petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford, 110 F.3d at 1389.

Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court violated California Penal Code section 654.

3. Restitution

In Ground Four, Petitioner asserts that the trial court erred in imposing the maximum fine without considering Petitioner's ability to pay. (ECF No. 1 at 5, 38–42.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's restitution claim, the California Court of Appeal stated:

> Castillo contends he was denied due process of law under the federal and California Constitutions, as well as violating his Eighth Amendment right to be free of excessive punishment pursuant to *People v. Dueñas, supra*, 30 Cal.App.5th 1157 because the trial court did not conduct an ability to pay hearing prior to imposing a $10,000 restitution fine pursuant to section 1202.4, subdivision (b).[8] Neither Castillo nor his attorney objected to the imposition of the restitution fine, and there was no request for an ability to pay hearing. Anticipating the People's forfeiture argument, Castillo argues his trial counsel was ineffective for failing to request an ability to pay hearing.
>
> ***Analysis***
>
> We begin our analysis by noting that *Dueñas* was decided on January 8, 2019, nearly four years before Castillo was sentenced on November 4, 2022. Castillo did not object to the imposition of fines and fees, and he did not request an ability to pay hearing. Generally, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge them on appeal. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624.) This is particularly true in cases such as this one where sentencing occurred after the *Dueñas* court found a constitutional right to have courts determine ability to pay prior to imposing mandatory fines and fees. (*Greeley*, at p. 624.) Further, we cannot say an objection on constitutional grounds would have been futile. (See *People v. Welch* (1993) 5 Cal.4th 228, 237.)
>
> We also find that the failure to object is excused by the doctrine that we may still review "pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court." (*People v. Welch, supra*, 5 Cal.4th at p. 235.) While our court has previously been divided on the issue of forfeiture where there was no opportunity to object because *Dueñas* had not yet

---

[8] The court also imposed, then stayed, a $10,000 parole revocation restitution fine pursuant to section 1202.45.

> been filed when an objection could have been timely made (e.g., *People v. Montes* (2021) 59 Cal.App.5th 1107, 1119–1121 [forfeiture excused where futile or unsupported by existing law]; contra, *People v. Son* (2020) 49 Cal.App.5th 565, 596–598; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073– 1074), we are in agreement that the question of ability to pay is a fact-intensive inquiry and not a pure question of law. (*Montes*, at p. 1121; *Son*, at p. 591; *Lowery*, at pp. 1060– 1061; *Aviles*, at pp. 1074–1075). Castillo's claim, therefore, is forfeited.

Castillo, 2024 WL 1473750, at *14–15 (footnote in original).

By statute, federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). As § 2254(a)'s "in custody" requirement is jurisdictional, "it is the first question [the Court] must consider." Bailey v. Hill, 599 F.3d 976, 978 (9th Cir. 2010) (quoting Williamson v. Gregoire, 151 F.3d 1180, 1182 (9th Cir. 1998)).

Section 2254(a)'s language "explicitly requires a nexus between the petitioner's claim and the unlawful nature of the custody." Bailey, 599 F.3d at 980. Here, Petitioner's "challenge to the restitution order lacks any nexus, as required by the plain text of § 2254(a), to his custody. While [Petitioner]'s liberty has been severely restrained by his conviction and custodial sentence, the remedy that [Petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact—and is not directed at the source of the restraint on—his liberty." Id. at 981. Accordingly, the undersigned recommends finding that Petitioner is not entitled to habeas relief on Ground Four.

**C. Ineffective Assistance of Counsel**

In Ground Five, Petitioner asserts ineffective assistance of trial counsel for failure to object to the restitution amount. (ECF No. 1 at 43–45.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> Castillo further maintains, however, that his trial counsel was ineffective for failing to make a motion for the trial court to conduct an ability to pay hearing. Criminal defendants have a constitutional right to effective assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; see *People v. Waidla* (2000) 22 Cal.4th 690, 718.) To prevail, the defendant " 'must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To establish deficient performance, the defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland*, at pp. 687–688; *Mickel*, at p. 198.)
>
> "On appeal, we do not second-guess trial counsel's reasonable tactical decisions." (*People v. Lucas* (2014) 60 Cal.4th 153, 278, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) A defendant's burden is difficult to carry on direct appeal. Reviewing courts reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence defense counsel had " ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel, supra*, 2 Cal.5th at p. 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.)
>
> Although Castillo argues that trial counsel was ineffective by failing to object, counsel is presumed competent. (See *Strickland v. Washington, supra*, 466 U.S. at p. 690.) Further, "a defense counsel's decision whether to object to the imposition of fines and fees can encompass factors beyond a defendant's financial circumstances." (*People v. Acosta* (2018) 28 Cal.App.5th 701, 707.) "We cannot speculate, given the absence of information before us, what led to defense counsel's decision not to object, but a myopic focus on [Castillo's] financial circumstances that neglects any of the other factors at play in a sentencing hearing may not provide an accurate picture of counsel's strategic calculus." (*Ibid.*)
>
> If the record on direct appeal does not indicate why counsel acted or failed to act in the challenged manner, appellate courts must reject the claim on appeal unless (1) counsel was asked for and failed to provide a satisfactory reason or (2) there is simply no reasonable explanation. (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Where the record fails to affirmatively demonstrate that the defendant's counsel had no rational tactical purpose for failing to object to the imposition of fines and fees, counsel may have had access to information about the defendant's financial status. This would include the possibility of his earnings while in prison that would make an objection unsuccessful. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 226.)
>
> The record here does not illuminate why defense counsel chose not to request an ability to pay hearing. Castillo, who was 37 years old at the time of his offenses and a year older at sentencing, was apparently healthy and able-bodied. He possessed a truck and .380-caliber handgun. He was found in possession of ammunition and illegal drugs. Castillo had the financial means to acquire these things and appeared to suffer no physical or mental disability that would prohibit

> him from earning wages in prison. On an otherwise silent record, counsel may have had access to Castillo's financial information that would have made futile a motion on Castillo's ability to pay fines and fees.[9] Castillo has forfeited this issue and failed to show how or why his counsel was ineffective for failing to request an ability to pay hearing.

Castillo, 2024 WL 1473750, at *15–16 (footnote in original).

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two

[9] Although the record is silent on this point, Castillo refused to be interviewed by the probation officer about, inter alia, his personal and employment histories.

apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 575 U.S. 312, 316–17 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

"[W]e simply do not know what information" counsel had access to and what factors he took into consideration in deciding not to object to the restitution amount. Dunn v. Reeves, 594 U.S. 731, 740 (2021). "So given that the [California] court was entitled to reject [Petitioner's] claim if trial counsel had any 'possible reaso[n] ... for proceeding as they did,' it surely was not obliged to accept [Petitioner's] blanket assertion on an incomplete evidentiary record that '[n]o reasonable strategy could support counsel's failure[.]'" Id. at 741–42 (internal citations omitted). "The burden to demonstrate that counsel performed deficiently falls on [Petitioner], and 'the absence of evidence cannot overcome the strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" Atkins v. Bean, 122 F.4th 760, 774 (9th Cir. 2024) (quoting Burt v. Titlow, 571 U.S. 12, 23 (2013)).

Based on the foregoing, Petitioner has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the state court's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of counsel.

\\\

\\\

**D. Admission of Uncharged Criminal Conduct**

In Ground Six, Petitioner asserts that the trial court erred in admitting evidence of uncharged criminal conduct. (ECF No. 1 at 46–55.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> Castillo contends the trial court erred in admitting evidence of uncharged criminal acts committed against Gabriella. The People argue the evidence was relevant to show how and why Castillo made inculpatory statements to Gabriella. We find that this evidence was admissible and not unduly prejudicial.
>
> ***Evidentiary Hearing, Trial Objections, and Jury Instructions***
>
> The trial court conducted a hearing pursuant to Evidence Code section 402 concerning the admissibility of uncharged crimes Castillo allegedly committed against Gabriella. In their written motion, the People moved to admit Gabriella's testimony that Castillo made incriminating statements and had access to the firearm he used to assault Santos. Castillo's written motion sought to exclude Gabriella's prior statements as inadmissible hearsay, irrelevant, and unduly prejudicial.
>
> At the hearing, defense counsel explained that she objected to statements such as when Castillo asked Gabriella to have sex with him because she was a minor when the events happened. Defense counsel did not have a problem with statements Gabriella made about Castillo possessing a gun but was concerned about allegations of Castillo having a relationship with a minor, and in particular, his request that Gabriella have sex with him. Defense counsel did not object to Castillo's statements that he was going to be locked up, he had done something, and that night would be the last night Gabriella would see him.
>
> The prosecutor objected to the sanitization of the relationship between Castillo and Gabriella because it showed how Gabriella came into possession of her knowledge about Castillo's possession of a gun and his inculpatory statements. The prosecutor thought the jury would want to know how Gabriella came into possession of the knowledge she had about Castillo. Defense counsel retreated from her position and requested "just sanitization regarding her age." The prosecutor agreed there was little relevance to Gabriella's age.
>
> The trial court noted that after seeing Gabriella in court, it would not have guessed she was a minor and doubted the jury would speculate about her age either. The court deferred ruling on whether Gabriella could be asked about her age and

denied defense counsel's request to exclude the remainder of Castillo's statements to Gabriella. The court found it was highly relevant within the context of Castillo stating that evening would be the last night Gabriella would see him that he also asked her to have sex with him. It suggested Castillo thought he was going to be arrested. The court noted it was a reasonable inference for someone to ask to have sex with their girlfriend before being incarcerated.

The trial court found the statements relevant within the context of Evidence Code section 352 to issues in the case, including whether Castillo committed a felony offense. The court described Castillo's statements as admissions by a party and therefore admissible hearsay evidence. It was also relevant to whether Castillo committed an earlier crime. The court found that before the People introduced evidence of Gabriella's age, they would have to explain how it was relevant and how its probative value outweighed any prejudicial effect.

During the trial, defense counsel objected twice to questions the prosecutor asked Gabriella. When Gabriella was asked by the prosecutor if Castillo wanted to have sex with her the day she went to the police station, defense counsel's objection to the line of questioning was overruled. Gabriella denied Castillo had asked her for sex that day. Defense counsel's objection pursuant to Evidence Code section 352, subdivision (b) to the prosecutor's question about Castillo placing his face on Gabriella's vagina was overruled. Defense counsel objected under Evidence Code section 352 to the entire line of questioning of Officer Huckabee, whose testimony set forth all of Gabriella's prior inconsistent statements.

Later during the trial, the prosecutor sought to introduce photographs taken of Gabriella's injuries to her neck and forearm in order to corroborate Huckabee's testimony. The trial court denied the motion explaining that the photographs could confuse the issues. The court noted the jury was not convened to decide if Castillo committed domestic violence or sexual assault and denied the prosecutor's motion to introduce the photographs pursuant to Evidence Code section 352.

Both the prosecutor and defense counsel argued to the jury that it could not consider potential offenses Castillo may have committed against Gabriella as evidence Castillo committed offenses against Santos. Prior to the end of the People's case-in-chief, the trial court instructed the jury with this special limiting instruction:

> "I wanted to cover something with the jurors this morning. Yesterday, you heard testimony from Gabriella .... And she was asked some questions about an alleged sexual assault and [a] domestic violence incident that occurred between herself and ... Castillo. And the Court wants to instruct you that you are not to consider that evidence as propensity for ... Castillo to commit any other type of assaultive crimes.
>
> "And I also want to let the jurors know that ... Castillo—he obviously is not charged with any of those crimes in this case, nor has he been charged with those crimes.
>
> "That evidence was offered to impeach the credibility of Gabriella ..., and so was the testimony of Officer Huckabee, who testified about her statements to—Officer Huckabee testified about [Gabriella's] statements to her when [Gabriella] reported these incidents to the Atwater Police Department. The focus of that evidence was the firearm that [Gabriella] reported and the statements that were made by ... Castillo."

The court further instructed the jury toward the end of trial with CALCRIM No. 303 (Limited Purpose Evidence in General):

> "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. You may not consider evidence of the alleged sexual assault or domestic violence pertaining to Gabriella ... as evidence that [Castillo] was predisposed to commit, or had the propensity to commit the assault charged in this case."

***Analysis***

Evidence of Castillo's uncharged acts against Gabriella was not admitted to show intent, knowledge, common plan, or scheme. (See Evid. Code, § 352, subd. (b).) The People sought to introduce inculpatory statements Castillo made to Gabriella about one week or so after his encounter with Santos. Gabriella either denied making these statements or evasively claimed she forgot that she had made them to Huckabee. The prosecutor needed to establish that Gabriella was denying her previous statements to introduce them as prior inconsistent statements through Huckabee's testimony. For the jury to understand the context of why Gabriella made a report to Huckabee concerning Castillo's self-incriminatory utterances and how she knew about his possession of a gun, the prosecutor was allowed to show the nature of their relationship and that there had been an assaultive encounter between Castillo and Gabriella. The violence Castillo employed against Gabriella also served to explain why she had reason to fear him, which created the context to explain her inconsistent trial testimony.

A statement inconsistent with a witness's trial testimony is not made inadmissible by the hearsay rule as long as the witness either had the opportunity to explain or deny the statement while testifying or has not been excused from giving further testimony. (Evid. Code, § 770.) Once the witness has made an inconsistent statement and was given an opportunity to explain his or her prior statement, prior inconsistent statements admitted under Evidence Code section 1235 may be considered for their truth as well as for impeachment. (*People v. Chhoun* (2021) 11 Cal.5th 1, 44.)

A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement if the conditions set forth in Evidence Code sections 1235 and 770 are met. The fundamental requirement of Evidence Code section 1235 is that the statement is indeed inconsistent with the witness's trial testimony. Courts test inconsistency in effect rather than express contradiction. A witness's claim of lack of memory amounting to deliberate evasion can imply inconsistency. As long as there is a reasonable basis in the record for concluding the witness's assertion that he or she cannot remember is evasive and untruthful, admission of prior statements is proper. (*People v. Homick* (2012) 55 Cal.4th 816, 859; *People v. Ervin* (2000) 22 Cal.4th 48, 84–85; *People v. Debouver* (2016) 1 Cal.App.5th 972, 980.) Gabriella's trial testimony was at times directly inconsistent with her statements to Huckabee, or it was deliberately evasive, which is tantamount to being inconsistent.

It is not necessary to show threats against the witness were made by the defendant personally or that the witness's fear of retaliation was directly linked to the defendant for the evidence to be admissible. A trial court can, therefore, correctly

find that such evidence was relevant and admissible subject to the balancing of its probative value and prejudicial effect under Evidence Code section 352. The prejudice referred to in this statute applies to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. Prejudicial is not synonymous with damaging. Trial courts enjoy broad discretion in assessing whether the probative value of evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. Where such discretionary power is statutorily vested in the trial court, its exercise of discretion must not be disturbed on appeal except upon a showing the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Williams* (2013) 58 Cal.4th 197, 270–271.)

Fear of the defendant is directly relevant to explain why a witness did not initially identify the defendant, and subsequent testimony from that witness is not more prejudicial than probative. Differences in statements from a witness are relevant to the witness's credibility. (*People v. Williams* (1997) 16 Cal.4th 153, 211–212; *People v. Flinner* (2020) 10 Cal.5th 686, 724.) Evidence that a witness is afraid to testify or fears retaliation is likewise relevant to his or her credibility. Evidence of possible intimidation would help explain why the witness, or witnesses, might repudiate earlier truthful statements. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946.)

Although Gabriella may have had other reasons to testify inconsistently from her prior statements to Huckabee, her tumultuous encounter with Castillo included physical battery, a sexual assault, and an assault with a firearm when Castillo pointed a gun at her. Castillo's conduct would certainly instill fear in most people and was a plausible explanation for her inconsistent trial testimony. The trial court did not abuse its discretion in allowing Huckabee to describe Castillo's assaultive behavior toward Gabriella in order to add context to Gabriella's report to Huckabee concerning Castillo's inculpatory statements and his possession of a handgun.

In his reply brief, Castillo argues that there was a less graphic and personal way to illustrate his relationship with Gabriella to impeach her. Castillo particularly objects to details such as his alleged pulling off Gabriella's underwear, punching and choking her, and biting her vagina. We disagree. Sanitizing Castillo's behavior, in essence sugar-coating it, would not give the jury the full context for why Gabriella would fear Castillo and give testimony contradictory to her report to Huckabee. We also agree with the People that Castillo's conduct toward Gabriella was not more inflammatory than his conduct toward Santos, an injured older man making his way in a walker, that the evidence was unfairly prejudicial. (See *People v. Case* (2018) 5 Cal.5th 1, 41, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

Any negative effect to Castillo from Gabriella's report to Huckabee of Castillo's uncharged assaultive conduct was mitigated by the trial court's two limiting instructions to the jury. The first instruction given during the trial specifically informed the jury that Castillo was not charged with assaults against Gabriella, to not use the information to determine if Castillo had a propensity to commit crimes, and the evidence was introduced to impeach Gabriella. Further, the court instructed the jury, "The focus of that evidence was the firearm that [Gabriella] reported and the statements that were made by ... Castillo." When the court later gave the jury final instructions, it used CALCRIM No. 303 that the evidence was submitted for a limited purpose. Further, the jury "may not consider evidence of the alleged sexual assault or domestic violence pertaining to Gabriella ... as evidence that [Castillo]

> was predisposed to commit, or had the propensity to commit the assault charged in this case."
>
> The effect of an instruction limiting how the jury can use evidence of uncharged crimes mitigates the potential for undue prejudice. (*People v. Thomas* (2023) 14 Cal.5th 327, 363 [instruction prohibiting jury from concluding based on other acts evidence that the defendant has a bad character or is disposed to commit crime.]) We presume the jury understood and followed the trial court's instructions. (*People v. Homick, supra*, 55 Cal.4th at p. 861.)
>
> Where the court limits the use of testimony or gives a specific instruction concerning particular evidence, we presume the jury followed the trial court's instructions and presume the jury did not consider the evidence for an improper purpose. (*People v. Williams, supra*, 58 Cal.4th at p. 271.) A limiting instruction concerning how the jury may consider evidence of other uncharged crimes helps ensure the defendant will not be convicted of the charged offense merely because his other uncharged crimes indicate he is a bad person with a criminal disposition. (*People v. Falsetta* (1999) 21 Cal.4th 903, 920.)
>
> The trial court did not abuse its discretion in permitting evidence of Castillo's domestic violence against Gabriella because it placed her report to Huckabee in context. It also served to explain why Gabriella had reason to fear Castillo and why her testimony was inconsistent with her prior report. Finally, any negative impact of the other crimes evidence was mitigated by the two limiting instructions the trial court gave to the jury.

Castillo, 2024 WL 1473750, at *5–8.

"Federal habeas courts generally do not review questions of state evidentiary law." Maquiz v. Hedgpeth, 907 F.3d 1212, 1217 (9th Cir. 2018) (citing Estelle v. McGuire, 502 U.S. 62, 67–68 (1991)). See Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules[.]"). "[C]learly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair," Andrew v. White, 604 U.S. 86, 96 (2025), but "nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence," Estelle v. McGuire, 502 U.S. 62, 70 (1991).

> A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision. "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." In such cases, "we must rely on the jury to sort [the inferences] out in light of the court's instructions." Admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw" from it.

Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir.), as amended on reh'g, 421 F.3d 1154 (9th Cir.

2005) (alterations in original) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)).

Here, during the trial, the jury was instructed:

> I wanted to cover something with the jurors this morning. Yesterday, you heard testimony from Gabriella . . . . And she was asked some questions about an alleged sexual assault and domestic violence incident that occurred between herself and Mr. Castillo. And the Court wants to instruct you that you are not to consider that evidence as propensity for Mr. Castillo to commit any other type of assaultive crimes.
>
> And I also want to let the jurors know that Mr. Castillo he obviously is not charged with any of those crimes in this case, nor has he been charged with those crimes.
>
> That evidence was offered to impeach the credibility of Gabriella . . . , and so was the testimony of Officer Huckabee, who testified about her statements to -- Officer Huckabee testified about [Gabriella]'s statements to her when she reported these incidents to the Atwater Police Department. The focus of that evidence was the firearm that [Gabriella] reported and the statements that were made by Mr. Castillo.

(1 RT[10] 208–09.) Additionally, the final jury instructions stated in pertinent part:

> During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. You may not consider evidence of the alleged sexual assault or domestic violence pertaining to Gabriella . . . as evidence that the defendant was predisposed to commit, or had the propensity to commit the assault charged in this case.

(1 CT 181.) The evidence in question was offered for impeachment purposes, which is a permissible inference, and the trial court specifically instructed the jury that the evidence should not be considered as evidence that Petitioner was predisposed or had the propensity to commit the offenses charged in the case. "A jury is presumed to follow its instructions," Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)), and there is no indication that the jury failed to do so here.

Based on the foregoing, the state court's denial of Petitioner's admission of evidence claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in

[10] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 9.)

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on Ground Six, and the claim should be denied.

## V.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **FOURTEEN (14) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **November 18, 2026**

/s/ Eric P. Grosjean

UNITED STATES MAGISTRATE JUDGE